Orville LOSIER and Wife Joelle Losier, Appellants,

v.

Shivarajpur K. RAVI, M.D. and Ambika Medical Group, P.A., Appellees.

No. 14–08–00399–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 10, 2009.

Mark C. Sparks, Beaumont, for appellants.

Teresa A. Carver, Robert G. Smith, Houston, for appellees.

Panel consists of Justices SEYMORE, BROWN and SULLIVAN.

## OPINION

JEFFREY V. BROWN, Justice.

Appellants Orville and Joelle Losier appeal a unanimous jury verdict in favor of appellees Shivarajpur K. Ravi, M.D., and Ambika Medical Group, P.A., on the Losiers' medical-malpractice claims. The Losiers contend that the trial court erred by refusing a *res ipsa loquitur* jury instruction and by denying a motion for new trial based on juror misconduct. We affirm.

I

After an automobile accident in 2002, Orville Losier was referred to Dr. Ravi for pain management. To treat Mr. Losier's lower-back pain, Dr. Ravi performed an IDET procedure on two levels of Mr. Losier's spine, the L4–L5 and L5–S1. The IDET procedure, or intradiscal electrothermic therapy, involves placing a catheter into a disc and heating the disc to stop its fluid center from leaking. A needle is used to introduce the catheter into the disc, and the physician watches the catheter's progress by viewing fluoroscopic x-ray images on a monitor. Dr. Ravi completed the procedure at level L4–L5, but at level L5–S1, after introducing the needle, he encountered difficulty manipulating the catheter. At some point, the catheter's tip sheared or broke off in Mr. Losier's disc, and Dr. Ravi decided to leave it there. Dr. Ravi later told Mr. Losier what had happened and that he believed that surgery to remove the catheter tip was unnecessary. Mr. Losier continued treatment with Dr. Ravi for about a year, and after that he began seeing another pain-management specialist, Dr. Syed. According to Dr. Syed, Mr. Losier reported that his back pain was getting "excruciatingly worse" since the catheter piece had been left in his disc.

In 2006, the Losiers sued Dr. Ravi and Ambika Medical Group for negligence,

gross negligence, malice, and loss of consortium. The Losiers sought unspecified damages for, among other things, physical pain and suffering, mental anguish, medical expenses, disfigurement, physical impairment, and loss of earnings and earning capacity in the past and in the future. Relevant here, the Losiers' pleadings included an assertion of *res ipsa loquitur* for leaving a piece of medical equipment in Mr. Losier.

In October 2007, the case was tried to a jury. After the defense rested, the Losiers objected to the trial court's charge on the ground that it did not include an instruction on *res ipsa loquitur*. The Losiers also submitted an instruction on *res ipsa loquitur* which the trial court denied. After deliberations, the jury returned a unanimous verdict in favor of the defendants.

The Losiers then filed a verified motion for mistrial or, in the alternative, verified motion for new trial, in which they contended that (1) the jury should have been instructed on the doctrine of *res ipsa loquitur*, and (2) a new trial should be granted because of jury misconduct and tampering. The second contention was supported by the affidavit of a paralegal for the Losiers' attorneys who averred that she saw the defense counsel's paralegal and Dr. Ravi's insurance representative conversing with a juror for at least ten minutes while on a lunch break during the trial. Following a hearing in which the trial court heard evidence on the juror misconduct allegation, the trial court denied the Losiers' motions. On February 21, 2008, the trial court signed a final judgment in favor of the defendants. This appeal ensued.[1]

## II

In their first issue, the Losiers contend that the trial court abused its discretion by failing to instruct the jury on *res ipsa loquitur* and that this failure likely led to an improper jury verdict. Specifically, the Losiers contend that *res ipsa loquitur* applies because this case involves negligence in the use of mechanical instruments and in leaving surgical instruments or sponges in the body. We review the trial court's refusal to submit an instruction for abuse of discretion. *See Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 791 (Tex.1995); *Weidner v. Sanchez,* 14 S.W.3d 353, 369 n. 3 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

*Res ipsa loquitur* applies to situations in which two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *Haddock v. Arnspiger,* 793 S.W.2d 948, 950 (Tex.1990); *Scott v. Beechnut Manor,* 171 S.W.3d 338, 343 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). It is not a separate cause of action from negligence; rather, it is a rule of evidence by which the jury may infer negligence. *Haddock,* 793 S.W.2d at 950.

In medical-malpractice cases, *res ipsa loquitur* is limited to those cases in which the doctrine had been applied as of August 29, 1977. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.201 (Vernon 2005); *Haddock,* 793 S.W.2d at 950; *Scott,* 171 S.W.3d at 343. Further, the doctrine applies only when the nature of the alleged malpractice and injuries are plainly within the common knowledge of laypersons, re-

---

1. During the pendency of this appeal, this court received a suggestion of death informing us that Orville Losier had died and that

Joelle Losier requested that the appeal continue. This court will proceed to adjudicate the appeal. *See* Tex.R.App. P. 7.7(a)(1).

quiring no expert testimony. *Haddock*, 793 S.W.2d at 951; *Ruiz v. Walgreen Co.*, 79 S.W.3d 235, 239 (Tex.App.-Houston [14th Dist.] 2002, no pet.). The three recognized areas in which *res ipsa loquitur* applies to medical-malpractice claims are (1) negligence in the use of mechanical instruments, (2) operating on the wrong portion of the body, and (3) leaving surgical instruments or sponges in the body. *Haddock*, 793 S.W.2d at 951; *Scott*, 171 S.W.3d at 338.

The Losiers argue that the evidence at trial demonstrated that the catheter was not defective and that Mr. Losier, in his sedated state, did nothing to cause the catheter to break. Additionally, the Losiers contend, despite Dr. Ravi's denial that the catheter was under his "exclusive control,"[2] both the Losiers' and Dr. Ravi's experts agreed that the catheter and needle were under his exclusive control. The Losiers further assert that the evidence excluded all possible causes of the catheter breaking "save for Dr. Ravi's vigorous manipulation of the catheter, and then his attempt to pull the bent catheter back through the needle." Therefore, they conclude, the evidence shows that the two factors necessary to apply *res ipsa loquitur* are present. *See Haddock*, 793 S.W.2d at 950.

■ But as the case law makes clear, the doctrine does not apply to those cases in which the use of the mechanical instrument is not a matter within the common knowledge of laypersons. *See Haddock*, 793 S.W.2d at 951; *Scott*, 171 S.W.3d at 338. The evidence showed that the IDET procedure involves the placement of a catheter into a person's disc to heat the disc to prevent the fluid inside the disc from leaking out. After the needle is inserted into the disc, the wire bends around and into the disc. The physician performing the procedure uses fluoroscopic guidance to guide the catheter. The physician must take a course to become qualified to perform the IDET procedure.

Further, the Losiers' expert, Dr. Ackerman, explained that when Dr. Ravi encountered difficulty in manipulating the catheter inside the disc, what he should have done next was "really hard to say" and "a judgment call." He went on to explain that it is customary to gently manipulate the catheter to get around the obstruction. Dr. Ackerman also opined that, when the catheter is bent around the needle tip, the standard of care is to withdraw the needle and the catheter at the same time. In this case, he opined, Dr. Ravi attempted to pull back the catheter only, causing the needle to shear off the catheter's tip. Contrary to Dr. Ackerman, Dr. Ravi's expert, Dr. Dai, opined that the catheter became stuck in a fissure, and there was no way to free it. She opined that Dr. Ravi did nothing negligent that caused the catheter to become stuck in a fissure. Dr. Dai also testified that a catheter can break despite the use of ordinary care. Both Dr. Ackerman and Dr. Dai agreed that the fact that the catheter broke did not indicate that Dr. Ravi used excessive force when manipulating the catheter.

The evidence concerning the IDET procedure generally and Dr. Ravi's use of the needle and catheter when performing the IDET procedure on Mr. Losier demonstrates that the nature of the alleged mal-

2. Specifically, the Losiers point to Dr. Ravi's testimony that he did not have exclusive control of the needle and catheter because to some extent "the disc directs where the catheter can go." The Losiers argue that this testimony was merely a clever attempt to create a fact issue that is irrelevant to the application of *res ipsa loquitur*. Our resolution of this issue, however, obviates the need for us to consider this testimony.

practice is not a matter plainly within the common knowledge of laypersons. *See Haddock*, 793 S.W.2d at 951; *Scott*, 171 S.W.3d at 338. The courts have held that many medical procedures involving mechanical instruments, some arguably less specialized than the IDET, fall outside the narrow application of *res ipsa loquitur. See, e.g., Haddock*, 793 S.W.2d at 954 (use of flexible colonoscope during proctological examination); *Scott*, 171 S.W.3d at 343–44 (operation of ventilator); *Wendenburg v. Williams*, 784 S.W.2d 705, 706–07 (Tex. App.-Houston [14th Dist.] 1990, writ denied) (use of pituitary rongeur); *Spinks v. Brown*, 103 S.W.3d 452, 459 (Tex.App.-San Antonio 2002, pet. denied) (insertion of Foley catheter); *Williford v. Banowsky*, 563 S.W.2d 702, 705–06 (Tex.Civ.App.-Eastland 1978, writ ref'd n.r.e.) (use of high-speed rotary instrument in dental treatment). Thus, this is not a case in which the category of negligence in the use of mechanical instruments applies.

Moreover, we are not persuaded that this case falls into the category of leaving a surgical instrument or sponge in the body. In *Traut v. Beaty*, the court noted that "*res ipsa loquitur* cannot be applied in every case in which an object is left in a patient's body" because to do so would "make the exception the rule." 75 S.W.3d 661, 667 (Tex.App.-Texarkana 2002, no pet.). The court reasoned that this conclusion "follows logically from the rule that res ipsa loquitur is inapplicable in medical malpractice cases, except when the nature of the alleged malpractice and injuries are plainly within the common knowledge of lay people." *Id.* at 666. In *Traut*, a physician left part of a wire in the patient's breast after performing a hook-wire needle localization procedure on her. *Id.* at 663. The court rejected the argument that *res ipsa loquitur* applied, reasoning that the evidence showed that whether the physician's decision to leave the piece of wire in

the patient was justified and whether a causal connection existed between the presence of the wire and the patient's pain were not matters plainly within the knowledge of lay people. *Id.* at 667–68.

The Losiers rely heavily on another case, *Steinkamp v. Caremark*, to support their contention that the trial court erred in refusing the requested instruction. *See* 3 S.W.3d 191 (Tex.App.-El Paso 1999, pet. denied) In that case, a catheter disintegrated inside the vein of a pregnant patient's arm, requiring her to undergo surgery to remove the catheter fragments without anesthesia. *Id.* at 193. The *Steinkamp* court concluded that the case was "one of those rare medical malpractice exceptions where *res ipsa loquitur* applies" because "[t]he nature of the alleged malpractice and injuries involves [the nurse's] act of leaving one piece of catheter inside Steinkamp's vein to travel dangerously toward her heart." *Id.* at 197.

But *Steinkamp* is distinguishable. There, the court determined that the case did not involve the use of a mechanical instrument; rather, it turned on the act of leaving a broken piece of a mechanical instrument inside the patient's body. *Id.* at 197. The court concluded that the particular act of leaving the piece of catheter in the patient's vein, which required her to undergo surgery without anesthesia, was not a situation in which expert testimony was needed. *Id.* at 196–97. In this case, however, the evidence shows that whether the catheter sheared off due to negligence, whether leaving the piece of catheter in Mr. Losier's disc, and the causal connection, if any, between the presence of the catheter and Mr. Losier's pain were matters not within the common knowledge of lay persons.

As discussed above, the experts presented opposing opinions concerning how the

catheter broke and whether Dr. Ravi was negligent in performing the IDET procedure. Additionally, whether it was negligent to leave the sheared catheter in Mr. Losier's body is not a matter within the common knowledge of laymen. Dr. Ravi testified that he did not unintentionally leave the catheter piece in Mr. Losier's disc, nor did he leave it because he forgot to retrieve it or was inattentive or not paying attention. Dr. Ravi testified that when the catheter broke off, he checked the fluoroscopy to determine that the piece was safely lodged within the disc. He testified that the standard of care in that situation was to leave the piece of catheter in place. Likewise, Dr. Dai testified that it was not below the standard of care for Dr. Ravi to leave the broken catheter in Mr. Losier. Further, one of Mr. Losier's treating physicians, noted in Mr. Losier's chart that the catheter in the L5–S1 disc was "nothing to be concerned about" and "really of no consequence." He further opined that "[i]t certainly does not warrant retrieval." Dr. Ackerman, the Losiers' expert, agreed that he had no reason to think that the catheter piece in Mr. Losier's disc was ever going to move, and that it would probably stay exactly where it is.

The experts also disagreed on whether the retained catheter caused or contributed to Mr. Losier's pain. Mr. Losier complained of pain, but Dr. Dai testified that there were other reasons for his pain. Dr. Dai testified that, although it was theoretically possible that the catheter may cause pain, given Mr. Losier's history, she could not confirm with reasonable medical probability that the catheter was causing him pain. In contrast, Dr. Atkinson opined that the retained catheter was contributing to Mr. Losier's pain, although he did not think it was the total cause of his pain.

Based on the evidence presented, therefore, we conclude that this case is more analogous to *Traut* than *Steinkamp*, because whether Dr. Ravi negligently performed the IDET procedure and whether the piece of catheter retained in Mr. Losier's disc caused or contributed to his pain are matters plainly not in the common knowledge of laypersons. *See Traut*, 667–68; *see also Shelton v. Sargent*, 144 S.W.3d 113, 120–21 (Tex.App.-Fort Worth 2004, pet. denied) (stating that the relevant inquiry is whether the proper performance of the medical procedures is commonly known or within the common knowledge of a layperson); *Arguello v. Gutzman*, 838 S.W.2d 583, 588 (Tex.App.-San Antonio 1992, no pet.) (rejecting applicability of *res ipsa loquitur* when jaw of meniscus grabber broke off in patient's knee during surgery and holding that proper use of the device was not a matter plainly within the common knowledge of laymen).

We therefore overrule the Losiers' first issue.

### III

■ In their second issue, the Losiers contend that the trial court erred in denying their motion for new trial based on juror misconduct. According to the Losiers, during a break in the trial their counsel's paralegal, Jana Tevis, saw an extensive conversation among a juror, the defense counsel's paralegal, and the defendants' insurance representative. The Losiers contend that the contact was sufficient to demonstrate misconduct and that they are entitled to a new trial. We review the trial court's denial of a motion for new trial for abuse of discretion. *Dir., State Employees Workers' Comp. Div. v. Evans*, 889 S.W.2d 266, 268 (Tex. 1994); *Stevens v. Anatolian Shepherd Dog Club of Am., Inc.*, 231 S.W.3d 71, 77 (Tex.App.-Houston [14th Dist.] 2007, pet. denied).

As a threshold matter, appellees contend that the Losiers waived their complaint of juror misconduct because they failed to complain before the verdict was read, citing *Alamo Carriage Service, Inc. v. City of San Antonio*, 768 S.W.2d 937 (Tex.App.-San Antonio 1989, no writ). In *Alamo Carriage*, the appellant claimed juror misconduct in his motion for new trial. *Id.* at 942–43. Because the appellant made no objection at the time of the incident or before the verdict, the appellate court overruled the complaint, stating:

> We believe that it would be wantonly unfair to allow a litigant to take his chances with the jury and later complain of misconduct when he is unhappy with the result. A party may not speculate on the result of a verdict and then for the first time complain of jury misconduct.

*Id.* at 943. The Losiers respond that, unlike the situation in *Alamo Carriage*, the jury misconduct was witnessed by a non-lawyer employee of the Losiers' law firm the day the jury returned its verdict, and there is no evidence the misconduct was actually brought to counsel's attention before the jury returned its verdict. The Losiers cite as support *Mercado v. Warner–Lambert Co.*, 106 S.W.3d 393 (Tex. App.-Houston [1st Dist.] 2003, pet. denied) (holding that appellant did not waive right to complain of jury misconduct not witnessed by appellant's counsel).

We conclude that the Losiers have not waived this issue. During the evidentiary hearing on the Losiers' motion for new trial, Tevis testified that she saw the encounter with the juror on the day before the jury returned its verdict, and at first she testified that she advised the Losiers' counsel, Mark Sparks, about it before the verdict was rendered. On redirect, however, she testified that Sparks approached the trial court about the alleged misconduct "immediately" after she told him about the encounter. The trial court asked Tevis why she did not tell Sparks earlier, and she responded that she was "caught up in trying to get [her] exhibits ready, trying to get back in the courtroom" when it "dawned on [her]" that the conversation's length "wasn't normal." The appellees offered no contrary evidence.

Thus, the evidence shows that Tevis brought the encounter to Spark's attention as soon as she realized, in the push toward the trial's conclusion, that the encounter may have been improper. Sparks then brought the encounter to the trial court's attention "immediately" thereafter. In this situation, and in the absence of contrary testimony, we conclude that the Losiers did not waive the issue of juror misconduct.

■ We next turn to the merits of the Losiers' issue. The Losiers' complaint regarding the alleged misconduct involving a juror is governed by Texas Rule of Civil Procedure 327(a), which provides, in pertinent part, as follows:

> When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury ... or because of any communication made to the jury, ... the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the communication made, ... be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

Tex.R. Civ. P. 327(a). Jury misconduct includes outside influence on jurors. *Strauss v. Continental Airlines, Inc.*, 67 S.W.3d 428, 446 (Tex.App.-Houston [14th Dist.] 2002, no pet.). "Outside influence"

has been held to mean information coming from outside the jury, i.e., from a non-juror who introduces information to affect the verdict, and not from within the jury's deliberations or as part of the jury's mental process. *Id.*[3]

To warrant a new trial for jury misconduct, the Losiers had the burden to prove that (1) there was misconduct, (2) it was material, and (3) probably caused injury. *See Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 372 (Tex.2000). Whether misconduct occurred is a question of fact for the trial court, and if there is conflicting evidence on this issue the trial court's finding must be upheld on appeal. *Id.; Pharo v. Chambers County,* 922 S.W.2d 945, 948 (Tex.1996). Misconduct justifies a new trial only if it reasonably appears from the record that "injury probably resulted to the complaining party." *Pharo,* 922 S.W.2d at 950. To show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he would otherwise have done on one or more issues vital to the judgment. *Id.* Determining the existence of probable injury is a question of law. *Id.*

To support their assertion that the juror's contact with the defense paralegal and insurance representative is sufficient to warrant a new trial, the Losiers cite to *Texas Employers' Insurance Association v. McCaslin,* 159 Tex. 273, 317 S.W.2d 916, 921–22 (1958), in which the supreme court held that the plaintiff's overt act in seeking out a juror and asking her to "do all you can to help me" was sufficient to demonstrate probable harm. The *McCaslin* court noted that "[a] juror's disavowal of

influence derived from misconduct is not a proper inquiry." *Id.* at 920. Instead, the court explained, the presence or absence of injury "must be drawn from overt acts such as conversations and physical actions, i.e., what was said and done." *Id.*

The Losiers argue that the jurors undoubtedly knew the paralegal, Monica Lee, worked for the defendants' attorneys because she was introduced in voir dire, and therefore the juror, Robert Mulvey, was aware of her relationship to the defendants. *Cf. Mercado,* 106 S.W.3d at 397 (holding that there could be no conscious or subconscious influence from shadow juror's contact with juror when juror was unaware of shadow juror's affiliation with a party). The Losiers further contend that because the insurance representative, John Southrey, had a pecuniary interest in the case, he and Lee were not far-removed from the case, but rather were "part and parcel" of the defense team. Given these relationships, the Losiers argue, injury should be presumed from the contact itself.

In her affidavit accompanying the Losiers' motion for new trial, Tevis stated that she was a paralegal for Mark Sparks of the Losiers' law firm. She further stated that while on a break during the trial, she saw Monica, the defendants' paralegal, and Dr. Ravi's insurance representative, "Johnny," outside the courtroom "eating their lunch while visiting with one of the jurors." She went into a conference room just inside the courtroom to organize her exhibits in preparation for a meeting with Monica. After more than ten minutes, she went back out into the hallway and "observed Monica and Johnny still visiting

---

**3.** Although the Losiers also refer, in a cursory fashion, to the right to a fair and impartial trial as guaranteed by the article I, section 15, of the Texas Constitution and the right to due process afforded by the Texas and United States Constitutions, they fail to present any argument, citations to the record, or citations to relevant authorities to support these references. Therefore, we do not consider them. *See* Tex.R. App. P. 38.1(i).

with this juror." Further, Tevis stated that the three of them were "actively engaged in conversation and laughing for at least ten (10) minutes."

In response, the defendants submitted the affidavits of Monica Lee, John Southrey, and the juror, Robert Mulvey. Lee stated in her affidavit that she was a paralegal at the defense counsel's firm, and that she had reviewed Ms. Tevis's affidavit and it was incorrect "with regard to what transpired." She stated that she and Southrey saw Tevis come out of the courtroom to ask to go over exhibits. Lee further stated that she and Southrey were sitting in the hall outside the courtroom eating lunch and talking only to each other. Mr. Mulvey overheard Southrey and her talking about Austin traffic, and he made several comments about it. Lee further stated that she told Mulvey that they could not talk until the trial was over, and Mulvey walked away. Finally, Lee stated that the exchange "did not take more than a few seconds and definitely did not take 10 minutes."

Southrey identified himself in his affidavit as a claim supervisor for Texas Medical Liability Trust. He stated that Tevis's recitation of the events was incorrect. He further stated that he and Monica saw Tevis come out of the courtroom to tell Monica something, and at that moment, he and Lee were sitting in the hall outside of the courtroom eating lunch and were not talking with Mulvey. Southrey stated that Monica "had already admonished [Mulvey] that we could not talk to him until the trial was over at which point he walked away from us." Southrey went on to state that Mulvey had apparently overheard him and Monica "talking about the fact I live in Austin" and Mulvey commented that Austin traffic was "horrible." Southrey said that he told Mulvey that he "agreed with [Mulvey's] observation, but I intentionally

tried not to even make eye contact with him at the time and continued with my lunch." Finally, Southrey stated that "Monica told him we could not talk until the trial was over, and Mr. Mulvey proceeded to walk away."

Robert Mulvey, the juror, averred that during the lunch break, he was outside the courtroom in the hall, looking out the window. He heard two people he did not know discussing Austin traffic. He commented to them that he traveled to Austin for business and that Austin traffic was "pretty bad." Mulvey averred that the female, whom he had since learned was Monica Lee of the defendants' law firm, "commented that we should not talk until after the trial." He further stated that, although he had seen both of them in the courtroom, he also did not know who the gentleman was or his reason for being there. Mulvey stated that "Ms. Lee instructed that there should be no conversation with jurors until after the trial was over" and that "[t]here was no further conversation with Ms. Lee or the gentleman."

At the evidentiary hearing before the trial court, only Tevis testified. Her testimony repeated the substance of her affidavit, except that she now knew that the juror's name was Robert Mulvey. She stated that when she first saw Lee, Southrey, and Mulvey, Lee and Southrey were sitting, finishing their meal, and Mulvey was standing. They were all facing each other and talking. Tevis left to get her exhibits in order, and when she returned five to ten minutes later, they were all "still talking, laughing, [and] having a conversation." She testified, however, that she could not hear the substance of the conversation. Additionally, she testified that she saw them three different times talking and laughing over a period of fifteen to twenty minutes. On cross-exami-

nation, Tevis admitted that, while she was in the courtroom, she could not see them or hear any of their comments. She also admitted that she did not know if Lee told Mulvey they could not talk to him or how many times Lee told him that. She also could not say who initiated the comments or what was discussed. In response to further questioning, Tevis stated that, after the verdict was rendered, she overheard Lee tell Mulvey "now you can talk to me."

The trial court criticized Southrey's and Lee's conduct, saying that they "should know better" and that it was not just the act of impropriety, it was the appearance of impropriety that should have been avoided. Nevertheless, the court found no evidence that Southrey, Lee, and Mulvey were talking about the case, and concluded that the Losiers failed to meet their burden under Rule 327(a). The trial court made no findings of fact or conclusions of law.

Because the trial court did not make findings of fact or conclusions of law, we assume that all findings support the judgment. *See Mercado,* 106 S.W.3d at 396. Although the parties dispute the length of time Southrey, Lee, and the juror Mulvey conversed, Tevis offered no evidence that they were discussing the case or that any favors were requested or received such as occurred in *McCaslin.* And, all three agreed that Lee told Mulvey that she and Southrey could not talk to him until after the trial, and there was no evidence to the contrary. Additionally, Mulvey stated in his affidavit that at the time he made his comments to Lee and Southrey, although he had seen them in the courtroom, he did not know who they were. This testimony undercuts the Losiers' argument that harm may be presumed in part because Mulvey was aware of Lee's relationship to the defendants, and in fact supports the

opposite conclusion. *See Mercado,* 106 S.W.3d at 397. On this record, we conclude that the evidence does not rise to the level required to presume injury for purposes of Rule 327(a). *See id.; Strauss,* 67 S.W.3d at 448. Therefore, we hold that the trial court did not abuse its discretion in denying the Losiers' motion for new trial on the ground of juror misconduct or tampering.

We overrule the Losiers' second issue.

\* \* \*

Having overruled the Losiers' two issues, we affirm the trial court's judgment.