

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00543-CV

**IN RE HOME DEPOT U.S.A., INC.** and Terry Lee Donelson

Original Mandamus Proceeding[1]

Opinion by:     Lori Massey Brissette, Justice

Sitting:        Beth Watkins, Justice
                Liza A. Rodriguez, Justice
                Lori Massey Brissette, Justice

Delivered and Filed: November 27, 2024

PETITION FOR WRIT OF MANDAMUS CONDITIONALLY GRANTED

After a personal injury jury trial, Samuel Forrester, the plaintiff, moved for a new trial based on incurable jury argument, juror misconduct, and factual insufficiency of the evidence. The trial court granted the motion on all three grounds and ordered a new trial.

Relators Home Depot, U.S.A., Inc. and Terry Lee Donelson, defendants below, filed a petition for writ of mandamus and an emergency motion to stay a new trial pending disposition of their petition. We granted the emergency motion, stayed the new trial, and advised Respondent and Real Party in Interest they could file responses, which they did.

Having considered the petition, the responses, and the record, we conditionally grant the petition for writ of mandamus.

---

[1] This proceeding arises out of Cause No. 2020-CI-15071, styled *Samuel Forrester v. Home Depot U.S.A., Inc. d/b/a Home Depot and Terry Lee Donelson*, pending in the 45th Judicial District Court, Bexar County, Texas, the Honorable Mary Lou Alvarez presiding.

## BACKGROUND

### Traffic Accident

On a dark, cloudy morning in San Antonio, Texas, shortly before 6:00 a.m., Samuel Forrester was driving his car northbound on North Foster Road towards the intersection with Farm to Market Road 78, intending to turn left (west) on FM 78. As Forrester was proceeding towards the intersection, Terry Donelson, driving a truck owned by Home Depot, pulled out of a gas station driveway on the west side of North Foster Road. When Donelson crossed the two southbound traffic lanes and began turning left (north), the right front of his truck struck the left side of Forrester's car. Forrester called 911 and reported the accident but did not report any injuries. Later, Forrester sought medical care for injuries he attributed to the accident.

### Personal Injury Suit

Forrester sued Donelson and Home Depot. He asserted claims for negligence, gross negligence, and negligence per se against Donelson. He alleged that Donelson was operating the vehicle in the course and scope of his employment, and under *respondeat superior*, Home Depot was also responsible. Forrester sought damages for his injuries including, inter alia, physical pain, mental anguish, and medical care expenses. The jury trial, which included testimony from seventeen witnesses and several hundred exhibits, lasted for ten days. Accepting the jury's verdict, the trial court rendered judgment that Donelson pay Forrester actual damages of $150,000, pre- and post-judgment interest, and court costs.

### Challenged Trial Proceedings

Forrester filed a motion for new trial. The trial court granted his motion based on the following three grounds.

*Incurable Jury Argument*

On the next to the last day of trial, defense counsel was examining a defense expert witness, about the difference between what is normally charged for healthcare services and what providers ultimately accept as payment. Defense counsel then asked "[I]s the amount that a jury awards tied to what someone ultimately pays for a procedure?" Before the witness could answer, the trial court immediately directed the jury to disregard the question.

*Juror Misconduct*

On the last day of trial, before closing arguments, Juror No. 5 saw defense counsel's paralegal in the break room getting coffee. He asked her if they could talk later; she said "I don't know" and walked away. The paralegal reported the incident to defense counsel who in turn advised the trial court in open court and on the record.

After the jury returned its verdict, the trial court released the jurors from service, and the attorneys for both sides met with the jurors. As the attorneys were leaving, Juror No. 5 asked Home Depot's lead counsel for the paralegal's phone number, which she gave him. He texted the paralegal later that day, and thereafter, a few more times.

*Insufficiency of Evidence in Support of the Jury's Findings*

In response to Question No. 1, the jury found both Donelson and Forrester negligent. It assigned 60% of the responsibility to Donelson and 40% to Forrester.

**Standard of Review**

Generally, we review a trial court's ruling on a motion for new trial under an abuse of discretion standard. *In re Whataburger Rests. LP*, 429 S.W.3d 597, 598 (Tex. 2014) (orig. proceeding) (per curiam); *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 762 (Tex. 2013) (orig. proceeding).

# INCURABLE ARGUMENT

First, we are called upon to determine if the trial court properly granted a new trial due to incurable jury argument.

## Parties' Arguments

In his motion for new trial, Forrester argued that he was entitled to a new trial because "Welborn stated in front of the jury that Mr. Forrester was not going to have to pay his total medical bills incurred by this collision." The record shows, though, that defense counsel (Welborn) did not make an affirmative statement, but asked a question about the relationship between the jury verdict and the actual amount to be paid for medical services. In his response to Relators' petition, Forrester acknowledged that "the Court immediately sustained the objection, admonished Ms. Welborn and instructed the jury to disregard her comments." Forrester, however, did not object to the question, did not ask for a jury instruction, and did not follow up by asking for a mistrial. Only after the jury returned its verdict did Forrester insist Welborn's question was incurable argument. He added that Welborn's statement also violated the trial court's limine order.

Relators first argue that Welborn's question did not address any benefits received by a third party to pay Forrester's medical expenses, and thus it did not violate the limine order. They also argue that even if Welborn's question—which the witness did not answer—violated the limine order, the trial court's instruction to disregard the question cured any harm.

## Witness Direct Examination

In a pretrial ruling, the trial court decided that the defendants' expert witness could opine on the reasonableness and necessity of Forrester's past medical expenses. At trial, Relators called James M. Graham, M.D. as an expert witness to testify by video recording. He testified about his education and experience including that he is an orthopedic spinal surgeon for adults, and he performed surgeries for thirty-two years. He reviewed Forrester's medical records, and he

concluded that Forrester "most likely did not sustain any significant injury" from the accident. He noted that "none of the radiological imaging studies, including the MRI scans, show any acute traumatic abnormality for traumatic injuries. And, in fact, they were completely normal for somebody in his age group." As Welborn asked him about the reasonableness of Forrester's claimed medical expenses for his two surgeries, they had this exchange.

MS. WELBORN: Do you have any opinions with regards to the charges that were incurred for those two surgeries?

DR. GRAHAM: I thought they were far in excess of what usually gets paid for those procedures.

MS. WELBORN: And what would you expect to receive as a customary reimbursement rate for those type of services?

DR. GRAHAM: Well, I typically got paid in the 2- to $3,000 range for the cervical fusion and somewhat less than that for the lumbar decompression surgery that he had.

The facility fee or what the hospital or surgery center gets paid for the cervical fusion is in the range of 15- to $20,000, and a hospital or surgery center would get paid probably about half of that for the lumbar laminectomy surgery.

You know, so my opinion is that the charges were very far in excess of what usually gets paid by insurance companies for these procedures.

Relators also called Brian D. Piper, who earned a Ph.D. in the field of economics, as an expert witness. He testified that "I have a tremendous amount of my work that is focused on health care, particularly charges and payments for health care." He added that "I testify and research what is normally paid and what is normally charged for healthcare service," and "I was asked to look at those surgical cost estimates in terms of reasonable value."

During his direct examination, the following exchange occurred.

MS. WELBORN: Okay. How does one determine what the reasonable value of a surgery is?

. . . .

DR. PIPER: So in the general, from an economic perspective, healthcare is kind of unlike almost anything else we purchase in the U.S. economy. If

you go to Best Buy and buy a TV, there's sticker price. You go to the register, that's the price you pay. You go to HEB, you buy milk, same thing. Sticker price, it's the price you pay.

Healthcare is different than that. Anyone who's ever received a bill from a healthcare provider, probably discovered that themselves. There's a difference between what was the bill charged for services and what ultimately the provider accepts as payment for the services. The other instances where that happens are sometimes car purchases and houses. And for those things, there may be a sticker price, but ultimately what you pay might be different.

Healthcare is different than cars or houses, though, in that a car or a house you may have a few percentage points difference than what you ultimately paid. But the gap between what gets paid for healthcare in the United States and what's charged for it is often a very, very large gap.

MS. WELBORN: And you just heard the testimony of Dr. Graham, correct?

DR. PIPER: I did.

MS. WELBORN: Okay. And his understanding and his opinions with regards to the reasonable numbers was different than what [Forrester's expert witness] provided, correct?

DR. PIPER: It was.

. . . .

MS. WELBORN: Do you agree with the opinions of Dr. Graham?

DR. PIPER: I agree with Dr. Graham's opinion that there is a vast difference between what he is normally paid for surgeries and what he accepts as his total payment for surgeries and what was billed and I found no fault with sort of the range of numbers that Dr. Graham indicated based on his experience he was paid for those same surgeries.

. . . .

MS. WELBORN: Okay. And just to understand, is the amount that a jury awards tied to what someone ultimately pays for a procedure?

THE COURT: Oh, my goodness. Sustained. Not only will the jury—you didn't hear a response because it was sustained. But the jury will disregard that question. That's not appropriate. What's the next question? The appropriate question.

## New Trial for Incurable Argument

"[I]ncurable argument is that which strikes at the very core of the judicial process." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) (citing *Living Ctrs. of Tex., Inc. v. Peñalver*, 256

S.W.3d 678, 681 (Tex. 2008) (per curiam)). Incurable argument includes statements such as "argument that . . . appeals to racial prejudice," "[u]nsupported, extreme, and personal attacks on opposing parties and witnesses," and "accusing the opposing party of manipulating a witness, without evidence of witness tampering." *Living Ctrs.*, 256 S.W.3d at 681 (citations omitted).

"The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Phillips*, 288 S.W.3d at 883 (quoting *Goforth v. Alvey*, 271 S.W.2d 404, 404 (Tex. 1954)). Further, "the complaining party generally must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects." *Living Ctrs.*, 256 S.W.3d at 680–81.

But "[i]ncurable jury argument is rare . . . because '[t]ypically, retraction of the argument or instruction from the court can cure any probable harm.'" *Phillips*, 288 S.W.3d at 883 (third alteration in original) (quoting *Living Ctrs.*, 256 S.W.3d at 680).

**Not Incurable Argument**

Forrester argues that Welborn's question was incurable jury argument because it "caused or contributed to the jury awarding only $250K in past medical cost." But Forrester does not explain how Welborn's question, in light of Dr. Graham's or Dr. Piper's testimony about the "very big gap" between what a provider billed and what it ultimately accepted as payment in full, was such an extreme utterance that but for her question, the jury would have awarded Forrester more than $250,000 for his past medical damages. *Cf. Phillips*, 288 S.W.3d at 883.

Further, Forrester does not explain how Welborn's question "[struck] at the very core of the judicial process." *See id.* It was not an appeal to racial prejudice; it was not an unsupported, extreme, personal attack on either Forrester or his witnesses; and it did not falsely accuse Forrester

of witness manipulation. *See Living Ctrs.*, 256 S.W.3d at 680 (types of incurable argument). And it "was not of the type characterized generally as prejudicial and inflammatory, and neither did it introduce into the case any new evidence of a material nature." *See Goforth*, 271 S.W.2d at 404.

**Instruction Cured Any Probable Harm**

Even if Welborn's question was improper, the trial court's instruction cured any probable harm. Before Dr. Piper could even answer Welborn's question, the trial court intervened to sustain an objection never made and to instruct the jury to disregard the question. Forrester did not argue or cite authorities to show how the nature, degree, and extent of Welborn's question was so problematic "that an instruction from the court . . . could not remove its effects." *See Living Ctrs.*, 256 S.W.3d at 680–81.

Having considered the question in light of the whole record, we conclude Welborn's question was "not so extreme as to be incapable o[f] cure." *See Phillips*, 288 S.W.3d at 883. Accordingly, the trial court abused its discretion by granting Forrester's motion for new trial based on incurable jury argument. *See id.*; *Living Ctrs.*, 256 S.W.3d at 681.

**JUROR MISCONDUCT**

Forrester insists that Juror No. 5's interactions with the defense's counsel and paralegal constituted juror misconduct. He argues there was evidence that Juror No. 5 improperly influenced the jury and caused them to find in favor of the defendants. He adds that Juror No. 5's encounters with the defense team probably caused him injury and supports ordering a new trial.

Relators argue that Forrester presented no evidence of materiality or probable injury. They note that Forrester did not call any witnesses or proffer any evidence, and his speculative and conclusory allegations, unsupported by any evidence, cannot support the trial court's order.

Before we address the parties' arguments, we provide some additional background.

**Pretrial Jury Instruction**

On January 24, 2024, after the jury was sworn, the trial court instructed the jurors and included this warning: "[P]lease do not mingle or talk with the lawyers, witnesses, parties, or anyone else involved in the case. You may exchange casual greetings such as hello and good morning, but other than that, do not talk with them at all."

**Break Room Coffee Station Encounter**

On February 2, 2024, the parties presented closing arguments. Before the jury was brought into the courtroom, one of the jurors spoke to defense counsel's paralegal, Ms. Marisol Mendiola, in the break room. Shortly thereafter, on the record in open court and outside the presence of the jury, Ms. Amy Welborn, lead defense counsel. reported the contact to the court.

| | |
|---|---|
| MS. WELBORN: | Your Honor, we have one issue this morning. I just wanted to let you know, in full transparency. Marisol was walking out of the bathroom and— |
| MS. MENDIOLA: | Not the bathroom. I was back there getting coffee, and one of the jurors said, The coffee's done, and I just nodded my head, poured the coffee. And he asked me, Are we allowed to talk after this? I just said, I don't know, and I walked away. |
| THE COURT: | Okay. Do you have, for the record, which juror that was? |
| MS. MENDIOLA: | Juror No. 5. |
| THE COURT: | Okay. He's been pretty vocal, and thank you for that. Any issues with that? |
| MS. BARTON: | I don't think so. |
| THE COURT: | Ms. Welborn, any issues with that? |
| MS. WELBORN: | No, Your Honor. I just wanted to disclose. |
| THE COURT: | I appreciate that. And, Ms. Mendiola, thank you very much for your disclosure, and you handled that situation correctly. Anything else, Ms. Welborn? |
| MS. WELBORN: | No, Your Honor. |
| THE COURT: | Okay. And for the attorneys, you will have an opportunity to speak with the jurors after they're done with their deliberations. It's an opportunity that I offer as a matter of practice. Likewise, when the jurors deliberate and after the alternates get their lunch, if they |

would like to speak with you, you may speak with them in my office outside the presence of the jurors that will be deliberating. So if you want to get that feedback for your practice and for your development, that is also an opportunity that I offer as a matter of routine.

**Verdict Rendered, Jury Dismissed**

After the jury was brought into the courtroom and charged, both sides made their closing arguments, and the jury was excused to deliberate. The same day, the jury returned its verdict, and the trial court read it in open court. The jury found that Donelson and Forrester were both negligent but Home Depot was not. The jury assigned 60% of the responsibility for the accident to Donelson and 40% to Forrester. It awarded Forrester $250,000 for past medical expenses, but did not award him any other damages.

After the jury was polled, the trial court thanked the jurors for their service, released them from jury duty, and advised them they were now free to "talk with everyone or no one."

**Elevator Encounter**

The attorneys for both sides talked with the jurors for a while. As the attorneys were leaving, Juror No. 5 approached Welborn in an elevator. While there with Donelson and Home Depot's corporate representative for the trial, Juror No. 5 asked Welborn for Mendiola's phone number. Welborn gave Juror No. 5 Mendiola's phone number by allowing him to take a picture of her phone, which was displaying Mendiola's cell phone number that is on her business cards and which she uses for work.

**Post-Jury-Release Attempts to Contact Mendiola**

Later that same day, Juror No. 5 sent Mendiola a text message, but she did not respond. After February 2, 2024, Juror No. 5 sent Mendiola more text messages, but she did not respond to any of them.

**Motion for New Trial**

On March 4, 2024, Forrester filed a motion for new trial. In his motion, Forrester referenced the break room coffee station and elevator encounters with Juror No. 5. He emphasized that Juror No. 5 served as the jury foreperson, and he asserted that "[b]ased on his motives and impartiality [sic], Juror No. 5 could have easily swayed the juror [sic] in favor of Defendants due to his personal gain and benefits." Forrester insisted that "it is overwhelming clear that juror misconduct was present during the trial and that this conduct was material."

**Hearing on the Motion**

At the hearing, Forrester did not call any witnesses, but his lead trial counsel, Ms. Stefani Barton, cross-examined two defense witnesses: Richard Powers and Marisol Mendiola.

*Powers, Mendiola Testimony*

Powers described the elevator encounter; he confirmed that Welborn gave Juror No. 5 Mendiola's phone number. Mendiola testified that during the trial, she had no contact with Juror No. 5 except for the coffee station encounter. She noted that the cell phone number Welborn gave Juror No. 5 after the verdict was read and the jury was released was the cell phone number on her business card. She confirmed that, after the jury was released, Juror No. 5 sent her a text message on February 2, 2024, and on multiple occasions thereafter, but she did not respond to any of them.

*Forrester's Argument, Evidence*

To prove juror misconduct, at the motion for new trial hearing, Barton gave the trial court a "little more context." Barton stated that after the verdict was delivered, the jury was released, and the trial court advised the jurors they were free to speak with anyone, Juror No. 5 approached her and her co-counsel in the courthouse. He "tells us how great we did, and then said some other words downstairs to us about the verdict is not indicative of how we perform[ed] and I hope Amy [Welborn] doesn't think that she did good just because the verdict was low."

Barton argued that juror misconduct occurred before the jury returned its verdict because "[Juror No. 5's] intent was clear, that he wanted to have some type of relationship with Ms. Mendiola before this trial ended." She suggested a theory: "There was something else said in the back that was not disclosed to this Court or, in the alternative, there was something stated amongst the parties and Juror No. 5 that allowed Amy [Welborn] to believe that [Juror No. 5] could have [Mendiola's] phone number after the reading of the verdict."

According to Barton, Juror No. 5's mere request for Mendiola's phone number "was not significant enough for anybody to pass a phone number of [anyone] in this courtroom, any party to a juror, especially that juror was the foreperson of this jury." She also asserted that "another juror had become buddy, buddy with . . . [J]uror No. 5 that she was picking him up every day and called him, this is my trial son."

Barton added that after the trial was over, when they were leaving the building, Welborn went out the north exit and Mendiola went out the south exit.

*Trial Court's Order*

In its order, the trial court's explanation for ordering a new trial based on juror misconduct reads in its entirety as follows:

> Specifically, Juror No. 5 had improper interactions with counsel for Defendants and her staff. Defendants' paralegal, Marisol Mendiola, was getting coffee prior to closing arguments. Juror [No.] 5 spoke to the paralegal and asked if the coffee was ready and if he could speak to her after. Defendants' counsel made the court aware of the incident on the record. After the verdict was read and the jury was released, Defendants' counsel, Amy Welborn, provided Juror [No.] 5 with the paralegal's phone number. After the verdict was entered and the jury was released and after Ms. Welborn provided the phone number for Ms. Mendiola, Juror [No.] 5 contacted Ms. Mendiola multiple times. The misconduct was material and caused injury. Juror No. 5 was the jury foreperson.

**New Trial for Juror Misconduct**

"To warrant a new trial for jury misconduct, the movant must establish (1) that the misconduct occurred, (2) it was material, and (3) probably caused injury." *In re Whataburger Rests. LP*, 429 S.W.3d 597, 598 (Tex. 2014) (orig. proceeding) (per curiam) (quoting *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000) (citing TEX. R. CIV. P. 327(a))).

"Whether misconduct occurred and caused injury are questions of fact for the trial court." *In re Health Care Unlimited, Inc.*, 429 S.W.3d 600, 602 (Tex. 2014) (orig. proceeding) (per curiam) (citing *Golden Eagle*, 24 S.W.3d at 372). "To show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he would otherwise have done on one or more issues vital to the judgment." *Id.* at 603 (quoting *Redinger v. Living, Inc.*, 689 S.W.2d 415, 419 (Tex. 1985)); *accord Pharo v. Chambers Cnty., Tex.*, 922 S.W.2d 945, 950 (Tex. 1996). "[T]estimony about what a person 'would have' done or what 'would have' happened under different circumstances is speculative and conclusory in the absence of some evidentiary support." *Whataburger*, 429 S.W.3d at 599; *see Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 161 (Tex. 2012) (noting that "merely invoking [a descriptive] phrase does not make otherwise conclusory or speculative testimony legally sufficient").

Forrester conclusively established the first element. In violation of the trial court's instructions, Juror No. 5 talked with Mendiola in the break room and asked her if they could talk afterwards. This was misconduct, but misconduct alone will not support a new trial. *See* TEX. R. CIV. P. 327(a); *Health Care Unlimited*, 429 S.W.3d at 602–03.

Forrester also had to prove that Juror No. 5's "misconduct most likely caused a juror to vote differently than he would otherwise have done on one or more issues vital to the judgment." *See Health Care Unlimited*, 429 S.W.3d at 603; *Redinger*, 689 S.W.2d at 419. To that end,

Forrester argued that Juror No. 5 improperly influenced the jury on the defendants' behalf because he wanted to have a relationship with Mendiola. Forrester surmised about what might have occurred beyond what was disclosed and identified another juror over which Juror No. 5 might have had some influence, but he did not present any evidence that additional communications occurred or that such influence did, in fact, impact the decision of another juror.

Juror No. 5's brief, pre-verdict communication with Mendiola, which did not involve the subject matter of the case, was no evidence of probable injury. *See Losier v. Ravi*, 362 S.W.3d 639, 649 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (overruling a juror misconduct issue based on a juror speaking with defense counsel and a defense witness during a break in the trial because there was "no evidence that they were discussing the case or that any favors were requested or received"); *Harker v. Coastal Eng'g, Inc.*, 672 S.W.2d 517, 523 (Tex. App.—Corpus Christi–Edinburg 1984, writ ref'd n.r.e.) (overruling the plaintiff's request for a mistrial because it concluded that "the conversation between [a juror] and [a defendant] was initiated by [the juror]; the conversation was very brief and nothing connected with the case was discussed").

Further, Forrester could have called Juror No. 5 to testify concerning his communications with Welborn and Mendiola or the other juror with whom Juror No. 5 had become friends concerning their communications while driving to and from the courthouse, but he did not. *See Golden Eagle*, 24 S.W.3d at 372 ("Juror testimony is still permitted on the issues of juror misconduct, communications to the jury, and erroneous answers on voir dire, provided such testimony does not require delving into deliberations."); *Chavarria v. Valley Transit Co.*, 75 S.W.3d 107, 110 (Tex. App.—San Antonio 2002, no pet.) ("Rules 327(b) and 606(b), however, do not bar juror testimony about conversations during a trial break.").

And Forrester's speculation that "something else [was] said in the back that was not disclosed to this Court [or] there was something stated amongst the parties and Juror No. 5" was

also no evidence that Juror No. 5 caused any juror to vote differently on any issue. *See Health Care Unlimited*, 429 S.W.3d at 603 ("To show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he would otherwise have done on one or more issues vital to the judgment."); *cf. Whataburger*, 429 S.W.3d at 599 ("[T]estimony about what a person 'would have' done or what 'would have' happened under different circumstances is speculative and conclusory in the absence of some evidentiary support."); *Barnett v. State*, 847 S.W.2d 678, 679 (Tex. App.—Texarkana 1993, no pet.) ("Conclusory allegations of jury misconduct are insufficient to require the court to grant a motion for new trial.").

**Improper Ground for New Trial**

Forrester proved that juror misconduct occurred, but he produced no evidence that the complained-of misconduct probably caused him injury. *See Whataburger*, 429 S.W.3d at 598. Accordingly, the trial court abused its discretion by granting a new trial based on juror misconduct. *See In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 761 (Tex. 2013) (orig. proceeding) ("Because the record does not support the articulated reason, the trial court abused its discretion by granting a new trial on that ground.").

**FACTUAL INSUFFICIENCY OF PLAINTIFF'S NEGLIGENCE**

Forrester also contends that the jury's answers to Question No. 1 were against the great weight and preponderance of the evidence.

**Parties' Arguments**

The parties dispute the sufficiency of the evidence supporting the jury's findings that Forrester was negligent and bore 40% of the responsibility for the accident. Forrester insists he was not negligent, but the jury found differently.

**Jury Charge Question No. 1**

The charge's first question reads as follows:

Question No. 1: Did the negligence, if any, of those named below proximately cause the incident in question?  Answer "yes" or "no" for each of the following:

    A.    Terry Lee Donelson

    B.    Home Depot USA, Inc

    C.    Samuel Forrester

If you answered "yes" to Question 1 for more than one of those named below, then answer the following question.  Otherwise, do not answer [Question No. 2].

Assign percentages of responsibility only to those you found caused or contributed to cause the injury.  The percentages you find must total 100 percent.

For the yes-no questions on negligence, the jury answered yes for Donelson, no for Home Depot, and yes for Forrester.  In answering Question No. 2, the jury assigned 60% of the responsibility for the accident to Donelson, 40% to Forrester, and 0% to Home Depot.

**Factual Sufficiency Review**

"When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *accord Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).  As a reviewing court, "[w]e consider and weigh all of the evidence presented at trial in a neutral light." *Cotter & Sons, Inc. v. BJ Corp.*, 549 S.W.3d 715, 722 (Tex. App.—San Antonio 2017, pet. dism'd) (quoting *In re C.Z.B.*, 151 S.W.3d 627, 630 (Tex. App.—San Antonio 2004, no pet.)); *see Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998).  However, we "may not pass upon the witnesses' credibility or substitute [our] judgment for that of the jury." *Mar. Overseas Corp.*, 971 S.W.2d at 407; *accord Parker v. RAD Trucking, LTD.*, 687 S.W.3d 735, 739 (Tex. App.—San Antonio 2024, no pet.).

"'[T]he jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony' [and its role is] 'to resolve inconsistencies within or conflicts among the witnesses' testimony.'" *Givens v. Anderson Columbia Co.*, 608 S.W.3d 65, 70 (Tex. App.—San Antonio 2020, pet. denied) (quoting *Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198, 209–10 (Tex. App.—San Antonio 2013, pet. denied)).

**Evidence of Negligence**

Forrester's trial testimony about how the accident occurred was inconsistent with his prior statement in his 911 call and it conflicted with Donelson's testimony and the evidence. Forrester testified that as he was driving northbound on North Foster Road, he saw Donelson's truck while it was still in the gas station parking lot. He heard Donelson start his truck, saw Donelson back up his truck, watched as Donelson pulled forward and looked to his left, and then saw Donelson pull out of the gas station onto North Foster Road. When he saw Donelson's truck, "I pulled the car all the way over in the right-hand lane as far as I could go." He repeatedly insisted that "I was never in the left-turn lane."

But when the recording of Forrester's 911 call was played, the jury heard Forrester say that he "was coming over in the left-hand turning lane [and he] had [his] turn signal [on] to turn left" just before Donelson's truck struck his car. On cross-examination, Forrester acknowledged that he had told the 911 operator he was in the left-turn lane with his left-turn signal on.

Further, Forrester introduced a photograph of his car at rest after the accident. It showed his car facing west across North Foster Road with the back half of his car in the northbound left-turn lane and the front half of his car in the leftmost southbound lane.

The jury could have believed (1) Forrester's undisputed testimony that he saw Donelson's truck well in advance of the accident, (2) his acknowledged statement in his 911 call that he was in the left-turn lane when his car was struck, and (3) Forrester's own exhibit of a post-accident

photograph showing his car at rest straddling the double-yellow line. It could have disbelieved Forrester's trial testimony that (1) he was never in the left-turn lane, (2) he swerved to the right to avoid Donelson's truck, and (3) he did all he could to avoid the accident.

Accordingly, we conclude the evidence was factually sufficient to support the jury's findings that both Donelson and Forrester were negligent and its assignments of responsibility for the accident at 60% to Donelson and 40% to Forrester. Therefore, its findings were not against the great weight and preponderance of the evidence as to make its findings manifestly unjust. *See In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 211 (Tex. 2009) (orig. proceeding); *Givens*, 608 S.W.3d at 70; *Cotter & Sons*, 549 S.W.3d at 722.

**Trial Court's Explanation**

In its order, the trial court's explanation for granting Forrester's motion for new trial based on factual insufficiency reads in its entirety as follows.

> The Court finds that the evidence is factually insufficient to support a finding of negligence in question one as to Plaintiff. The jury findings that the Plaintiff was 40% liable for the collision and that Mr. Donelson was 60% liable for the collision is against the overwhelming evidence. The overwhelming weight of the evidence demonstrated that the negligence of the Defendant Donelson was greater than 60% allocated by the jury to Defendant Donelson. The overwhelming weight of the evidence demonstrated that the negligence of Plaintiff Forrester was less than the 40% allocated by the jury to Plaintiff Forrester. Mr. Forrester's own negligence did not contribute to the cause of the collision in question. The evidence is factually insufficient to support a jury finding that Plaintiff's own negligence contributed to the cause of the collision in question. Therefore, the jury's answer to Question One is factually insufficient and the Motion for New Trial is granted as to the factual sufficiency of the jury's answer to Question One.

**Order Must Explain Trial Court's Reasoning**

"[T]rial courts have significant discretion in granting new trials [but] such discretion should not, and does not, permit a trial judge to substitute his or her own views for that of the jury without a valid basis." *Columbia*, 290 S.W.3d at 212 (citation omitted); *see Toyota*, 407 S.W.3d at 756–57 (stating requirements for an order granting a new trial). "Usually, the mere recitation of a legal

standard, such as a statement that a finding is against the great weight and preponderance of the evidence, will not suffice." *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 689 (Tex. 2012) (orig. proceeding); *see Toyota*, 407 S.W.3d at 757.

"The order must indicate that the trial judge considered the specific facts and circumstances of the case at hand and explain how the evidence (or lack of evidence) undermines the jury's findings." *United Scaffolding*, 377 S.W.3d at 689; *see Toyota*, 407 S.W.3d at 757. The explanation must be understandable and reasonably specific. *Toyota*, 407 S.W.3d at 757 (quoting *Columbia*, 290 S.W.3d at 213). It must also be "'cogent,' 'legally appropriate,' 'specific enough to indicate that the trial court did not simply parrot a pro forma template,' and issued 'only after careful thought and *for valid reasons*.'" *Id.* (quoting *United Scaffolding*, 377 S.W.3d at 688). "A trial court abuses its discretion if its new-trial order provides no more than a pro forma template rather than the trial judge's analysis." *United Scaffolding*, 377 S.W.3d at 689.

**Explanation Deficient**

To grant Forrester's motion for new trial based on the jury's findings being against the great weight and preponderance of the evidence, the trial court's order needed to "indicate that the trial judge considered the specific facts and circumstances of the case at hand and explain how the evidence (or lack of evidence) undermines the jury's findings." *See United Scaffolding*, 377 S.W.3d at 689. It did not.

The order did not recite *any* specific facts or circumstances the trial court considered to conclude that the jury's findings were against the great weight and preponderance of the evidence. *Contra id.* Instead, it merely repeated, in slightly varied forms, bare assertions of a violated legal standard (factual sufficiency): e.g., the jury's findings on percentages of responsibility were "against the overwhelming evidence." These mere recitations of a violated legal standard are not sufficient. *See id.* (rejecting as insufficient "mere recitation[s] of a legal standard").

It also does not explain why the jury's findings must be discarded and the case retried. *See Columbia*, 290 S.W.3d at 213 ("[T]he parties and public are entitled to an understandable, reasonably specific explanation why their expectations are frustrated by a jury verdict being disregarded or set aside, the trial process being nullified, and the case having to be retried.").

**Evidence Sufficient, Explanation Deficient**

Having reviewed all the evidence, we conclude the jury's findings were not against the great weight and preponderance of the evidence. Further, the trial court's order did not provide the required explanation. Accordingly, the trial court's order granting Forrester's motion for new trial for findings purportedly against the great weight and preponderance of the evidence was an abuse of discretion. *See Toyota*, 407 S.W.3d at 757; *United Scaffolding*, 377 S.W.3d at 689.

## CONCLUSION

Because the trial court abused its discretion by granting Forrester's motion for new trial, Relators have no adequate remedy by appeal. *See In re Rudolph Auto., LLC*, 674 S.W.3d 289, 298 n.5 (Tex. 2023) (orig. proceeding) (citing *Columbia*, 290 S.W.3d at 209–10) ("This Court has recognized that there is no adequate remedy by appeal when a district court issues an erroneous new-trial order.").

We conditionally grant Relators' petition. We order the trial court to vacate its April 30, 2024 order within ten days of the date of this opinion and order. After it does so, our order staying a new trial will be moot. We are confident the trial court will promptly comply. Our writ will issue only if it does not.

Lori Massey Brissette, Justice

- 20 -